VALLEY DISPOSAL, INC., Palisades Landfill and Recycling Corporation; Robert C. Dowdell, Jr., Plaintiffs–Appellants,

v.

CENTRAL VERMONT SOLID WASTE MANAGEMENT DISTRICT; C.V. Landfill, Inc., Defendants–Appellees.

No. 1012, Docket 93–7818.

United States Court of Appeals, Second Circuit.

Argued Feb. 14, 1994.

Decided Aug. 5, 1994.

John L. Franco, McNeil & Murray, Burlington, VT, for plaintiffs-appellants.

Michael B. Rosenberg, Miller, Eggleston & Rosenberg, Burlington, VT, for defendant-appellee C.V. Landfill, Inc.

Glenn C. Howland, Jr., McKee, Guiliani & Cleveland, Montpelier, VT, for defendant-appellee Central Vermont Solid Waste Management Dis.

Before: MAHONEY and WALKER, Circuit Judges, and CAMPBELL,* Senior Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge:

In this appeal we review the district court's rulings (1) granting one defendant's motion to dismiss certain counts in the complaint for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, and (2) holding that all claims are barred by the doctrines of res judicata and collateral estoppel.

## BACKGROUND

Plaintiffs-appellants are Valley Disposal, Inc., a solid waste hauler, Palisades Landfill and Recycling Corporation ("Palisades Landfill"), operator of a *lined landfill* in Moretown, Vermont, and Robert C. Dowdell, Jr., president of Valley Disposal and Palisades Landfill. Dowdell and his wife are the sole shareholders and directors of Valley Disposal and Palisades Landfill. Dowdell is also the president, sole director, and sole shareholder of the now defunct Palisades Recycling Corporation, Inc. ("Palisades Recycling")—operator of an *unlined landfill* in Moretown, Vermont—which is not a party.

Defendants-appellees are Central Vermont Solid Waste Management District (the "District"), a Vermont union municipal district created by the Vermont General Assembly pursuant to Vt.Stat.Ann. tit. 24, §§ 4861–4868 (1975), and C.V. Landfill, Inc., owner and operator of an unlined landfill in East Montpelier, Vermont.

In the spring of 1992, the District requested quotations from and negotiated Interim Disposal Agreements with both Palisades Recycling and C.V. Landfill for solid waste disposal for municipalities within the District. Although Palisades Recycling refused to enter into the District's proposed Interim Disposal Agreement, C.V. Landfill agreed, on June 1, 1992, to provide landfill services commencing July 1, 1992. The contract's terms provided, *inter alia*, that the District, "[i]mmediately upon the execution of these presents, ... shall proceed to enact a District-wide solid waste flow control ordinance" that would, at a minimum, "contain solid waste hauler licensing and enforcement provisions, as well as a mechanism for designating [C.V. Landfill's] facilities as an authorized solid waste disposal site." On June 3, 1992, the District adopted the "Flow Control Ordinance" referred to in the Interim Disposal Agreement. The ordinance (1) regulated the collection, transportation, recycling, resource recovery, and disposal of solid waste within the District, (2) required licenses for the transportation of solid waste within the District, (3) directed the delivery of all solid waste generated within the District to facilities described in the ordinance, (4) prohibited the unlawful disposal of solid waste, and (5) provided for enforcement and penalties. The Flow Control Ordinance also established a District Regulatory Board, which, on July 29, 1992, adopted "Rules and Regulations Pertaining to the Collection, Transport and Dis-

---

* The Honorable Levin H. Campbell of the United States Court of Appeals for the First Circuit, sitting by designation.

posal of Solid Waste Pursuant to the Waste Flow Control Ordinance."

Plaintiffs have alleged in their district court complaint that the Interim Disposal Agreement, the Flow Control Ordinance, and the rules and regulations adopted thereunder, operating in concert, provide C.V. Landfill with the exclusive right to provide solid waste facility services to municipalities located within the District, and prohibit haulers from exporting any and all solid waste generated within the District to any facility located outside of the District—although C.V. Landfill is permitted to accept solid waste generated and brought in from outside of the District. In support of these allegations, Plaintiffs point out paragraph two of the District's Interim Disposal Agreement with C.V. Landfill, which states:

> [C.V. Landfill] shall . . . have the exclusive right to receive solid waste for processing . . . and disposal from the District waste service areas as shown on the map which is attached hereto as Addendum (B); and District shall so designate [C.V. Landfill's] facilities as the exclusive destination of such solid waste. In addition, [C.V. Landfill] may receive waste from non-District towns that so designate [C.V. Landfill's] facilities[;]

paragraph thirteen of the Interim Disposal Agreement, which reads:

> District, by ordinance, shall prohibit the exportation of District-generated solid waste for disposal at any facility not designated by the District[;]

and paragraph 5.1 of the Flow Control Ordinance, which provides:

> Solid Waste collected or generated in the District shall be delivered to a transfer station or Facility designated by the District. No person shall deliver, or cause to be delivered, Solid Waste in the District except to such Facilities designated by the District.

Palisades Landfill's lined landfill in Moretown, Vermont, is, as of November 1992, located outside of the District, and is not a facility designated by the District for the receipt of solid waste generated or collected in the District.

On July 22, 1992, Palisades Recycling, Dowdell's wholly-owned corporation, reacting to the Interim Disposal Agreement between C.V. Landfill and the District, as well as to the Flow Control Ordinance and its rules and regulations, sued the District in Washington County, Vermont, Superior Court. C.V. Landfill intervened as a defendant. Palisades Recycling sought to enjoin (1) the District from designating C.V. Landfill as the exclusive facility for all solid waste generated within the District if Palisades Recycling declined to execute the Interim Disposal Agreement as written, (2) the Flow Control Ordinance from taking effect on August 4, 1992, and (3) the District's contract with C.V. Landfill from continuing in effect. Palisades Recycling alleged, *inter alia*, that the District's actions infringed the dormant Commerce Clause, *see* U.S. Const. art. I, § 8, and were *ultra vires* under state law. After hearings in early September 1992, the Washington Superior Court denied Palisades Recycling's request for a preliminary injunction on September 21, 1992. The Vermont court found, among other things, that (1) the District's contract with C.V. Landfill and its proposed contract with Palisades Recycling "do not go beyond the District's grant of authority concerning its ability to assess and recover a surcharge on solid waste disposed of within the District"; (2) "[t]he evidence does not establish that the Flow Control Ordinance[,] as applied, violates the [C]ommerce [C]lause of the United States Constitution"; and (3) "the evidence does not establish irreparable harm to Plaintiff." On November 16, 1992, the Washington Superior Court entered summary judgment for the defendants—the District and C.V. Landfill—on all counts of the complaint. Palisades Recycling did not appeal from that decision.

A few months later, on February 23, 1993, Palisades Landfill, Valley Disposal, and Robert Dowdell brought the present complaint in the United States District Court for the District of Vermont against the District, C.V. Landfill, and Vermont Integrated Waste Solutions, Inc.[1] Plaintiffs charged that the Dis-

---

1. On March 8, 1993, Plaintiffs voluntarily dis-    missed Vermont Integrated Waste Solutions, Inc.

trict and C.V. Landfill had contracted, combined, and conspired to exclude Plaintiffs from competition in providing lined landfill disposal services to customers residing in the member municipalities that form the District. The five-count complaint alleged:

[I] [t]he contract, ordinance and regulations are unconstitutional in that they violate the "dormant Commerce Clause" of the U.S. Constitution Article I, Section 8[;][2]

\* \* \* \* \* \*

[II] [t]he actions of defendants constitute an[ ] unlawful contract, combination or conspiracy in the form of a trust or otherwise in restraint of trade or commerce among the several states in violation of 15 U.S.C. § 1 [of the Sherman Act], damaging plaintiffs[;]

\* \* \* \* \* \*

[III] [t]he actions of the defendants constitute an unlawful monopolization, attempt to monopolize, or a combination or conspiracy to monopolize solid waste disposal of any municipal solid waste generated within the member towns of the District, thus monopolizing a part of trade or commerce among the states in violation of 15 U.S.C. § 2 [of the Sherman Act], damaging plaintiffs[;]

\* \* \* \* \* \*

[IV] [b]y designating the C.V. Landfill as the exclusive "designated facility" for the disposal of solid waste, the "District Regulatory Board's" actions are *ultra vires* and void[; and]

\* \* \* \* \* \*

[V] [t]here is no primary or overriding public municipal purpose in the District's grant of exclusive monopoly rights to receive solid waste to the unlined C.V. Landfill. Rather the primary purpose is to promote the private ends of the C.V. Landfill. Any public purpose is at best incidental, set up as a mere pretext to conceal a private purpose, and is therefore *ultra vires* and void.

Plaintiffs sought compensatory damages and requested preliminary and permanent injunctions against the "operation and enforcement of the 'flow control' provisions of the contract [between the District and C.V. Landfill], [the] ordinance, and [the] regulations." Following an evidentiary hearing on March 11, 1993, the district court, on March 16, 1993, denied Plaintiffs' motion for a preliminary injunction, finding that Plaintiffs had failed to demonstrate "they are likely to suffer irreparable harm if the injunction is not issued."

Before the March 11, 1993, hearing, C.V. Landfill, on March 8, 1993, moved to dismiss the antitrust claims (Counts II and III) for failure to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). C.V. Landfill also moved to dismiss Plaintiffs' supplemental state law claims (Counts IV and V), as well as their § 1983 claim (Count I), for lack of subject matter and/or personal jurisdiction. Fed.R.Civ.P. 12(b)(1), (2). At the same time, the District moved to dismiss all counts and for summary judgment. The District contended that the claims in Counts I, IV, and V were barred by collateral estoppel (issue preclusion), having been earlier decided by the Washington Superior Court. The District joined in C.V. Landfill's motion to dismiss the antitrust claims (Counts II and

---

**2.** As amended on March 3, 1993, Count I came to read:

The contract, ordinance and regulations unconstitutionally discriminate facially and in effect against interstate commerce in violation of the "dormant" Commerce Clause of the U.S. Constitution Article I Section 8. Said discrimination on the part of the defendant District constitutes a deprivation under color of ordinance and regulation of the plaintiffs' rights, privileges and immunities secured by the U.S. Constitution in violation of 42 U.S.C. § 1983.

On March 22, 1993, Plaintiffs, pursuant to Fed. R.Civ.P. 15(a), moved to amend their complaint again primarily to seek declaratory and compensatory damages. *See infra* part II.A (setting forth the amended paragraph 2 of the complaint). The district court granted this motion. Then, on June 3, 1993, Plaintiffs sought leave for a further amendment. This request was followed on June 7, 1993, by yet a third motion to amend the complaint—bringing the total number of amendments or requested amendments to four (including the initial amendment as a matter of course). On July 23, 1993, the district court, upon granting C.V. Landfill's motion to dismiss and the District's motion for summary judgment, ruled that Plaintiffs' second and third motions to amend were moot.

III) for failure to state a claim, and additionally argued that Counts II and III were barred by res judicata (claim preclusion). Plaintiffs submitted memoranda in opposition to the motions to dismiss and for summary judgment. Then, on April 2, 1993, Valley Disposal filed a cross-motion for partial summary judgment on Counts I and IV.

The district court heard argument on all motions on May 26, 1993.[3] On July 23, 1993, the court issued an opinion and order in which it (1) granted C.V. Landfill's motion to dismiss Plaintiffs' antitrust claims (Counts II and III) *with* prejudice, (2) found that Count I of Plaintiffs' complaint stated a claim only against the District, (3) declined to retain jurisdiction over Plaintiffs' state law claims (Counts IV and V) against C.V. Landfill, and (4) granted the District's motion for summary judgment, ruling that Counts I, IV, and V were barred by collateral estoppel and that Counts II and III were barred by res judicata. Plaintiffs filed a notice of appeal on August 10, 1993.

## DISCUSSION

### I.

#### Standards of Review

We review de novo the lower court's granting of C.V. Landfill's motion to dismiss Counts II and III (the antitrust claims) for failure to state a claim upon which relief can be granted.[4] *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994). In so doing, "we accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (citing *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 86, —— L.Ed.2d —— (1994)).

We also review de novo the district court's ruling on summary judgment that Counts II and III (the antitrust claims) are barred by res judicata and that Counts I, IV, and V (the dormant Commerce Clause claim and the supplemental state law claims) are barred by collateral estoppel. *Sundance Cruises Corp. v. American Bureau of Shipping*, 7 F.3d 1077, 1080 (2d Cir.1993) ("We review the grant of a motion for summary judgment *de novo*, construing all facts in favor of [Plaintiffs], the nonmoving part[ies].")*, cert. denied*, —— U.S. ——, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994).

### II.

#### Dismissal of Antitrust Claims
#### (Counts II & III) [5]

#### A.

■ In dismissing the antitrust claims, the district court agreed with C.V. Landfill that Plaintiffs had not established federal jurisdiction, having failed to plead facts sufficient to show that the District's and C.V. Landfill's activities had "a not insubstantial effect on the interstate commerce involved." *McLain v. Real Estate Bd.*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980).[6]

---

**3.** The district court heard, among other things, (1) Plaintiffs' motion to amend their complaint, (2) C.V. Landfill's motion to dismiss, (3) the District's motion to dismiss and for summary judgment, and (4) Valley Disposal's cross-motion for summary judgment on Counts I and IV.

**4.** Whether a motion to dismiss an antitrust claim such as that brought by C.V. Landfill is more properly considered under Fed.R.Civ.P. 12(b)(1) or Fed.R.Civ.P. 12(b)(6) is an issue that has divided courts and commentators. *See, e.g., Seglin v. Esau*, 769 F.2d 1274, 1278–79 (7th Cir.1985) (observing that "at least two commentators and one federal district court have argued persuasively that a failure to allege an effect on interstate commerce is a failure to state a claim and not a failure to allege subject matter jurisdiction"). Regardless of which rule is preferable, our re-

view is de novo because "the trial court dismissed on the basis of the complaint alone." *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 594 (2d Cir.1993).

**5.** The District joined in C.V. Landfill's motion to dismiss, adopting and incorporating its memoranda in support thereof on all issues. Similarly, on appeal, "[t]he District specifically adopts and incorporates ... the arguments made by ... C.V. Landfill ... as to the propriety of the [d]istrict [c]ourt's dismissal of the [antitrust] counts."

**6.** This court has said there are two ways to establish the interstate commerce component of Sherman Act jurisdiction.

First, plaintiff may allege and prove that defendant's conduct is "within" the stream of inter-

Plaintiffs now challenge that ruling. They argue that the complaint's bare allegations of an effect on commerce, general and conclusory as they were, nonetheless satisfied minimum notice pleading requirements. Plaintiffs further assert that the testimony they presented at the March 11, 1993, preliminary injunction hearing adequately demonstrated that the District's and C.V. Landfill's conduct had "a not insubstantial effect" on interstate commerce, and that this sufficed. The testimony indicated, they say, that the defendants' activities adversely affected Plaintiffs' ability (1) to pay for out-of-state equipment and supplies, consultants, engineers, and contractors used to build and operate the lined landfill run by Palisades Landfill, and (2) to secure out-of-state permanent financing for that facility.

Like the district court, we think the complaint failed to meet standards enunciated by the Supreme Court in *McLain* and by this court in *Furlong v. Long Island College Hospital*, 710 F.2d 922 (2d Cir.1983) (affirming district court's dismissal of antitrust claim for failure adequately to plead antitrust jurisdiction). In *McLain*, the plaintiffs filed a complaint in the United States District Court for the Eastern District of Louisiana, alleging that real estate brokers in the Greater New Orleans area had "engaged in a price-fixing conspiracy in violation of § 1 of the Sherman Act." *McLain*, 444 U.S. at 234, 100 S.Ct. at 505. After considering briefs, deposition testimony, documents, and oral argument on the issue, the district court dismissed the complaint "for failure to establish the interstate commerce component of Sherman Act jurisdiction." [7] *Id.* The Fifth Circuit affirmed. Although the Supreme Court vacated the decision below, holding that, "[o]n the record thus far made, it cannot be said that there is an insufficient basis for petitioners to proceed at trial to establish Sherman Act jurisdiction," *id.* at 245, 100 S.Ct. at 510, it also stated that jurisdiction under the Sherman Act may not be invoked "unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce," *id* at 242, 100 S.Ct. at 509. In this vein, the Court continued: *"To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings." Id.* (emphasis added); *see Furlong*, 710 F.2d at 926. Only when allegations in the complaint are controverted did the Court place a further duty upon the plaintiff to "proceed to demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." *McLain*, 444 U.S. at 242, 100 S.Ct. at 509; *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 232.1, at 295 (1993 Supp.). Nowhere did the Court suggest that this latter burden was a substitute for minimally adequate allegations in the complaint of a relationship with some delineated aspect of interstate commerce.

While this court has said, "[w]e are mindful of the generous approach to pleading

state commerce. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Alternatively, plaintiff may allege and prove that defendant's conduct, although entirely local or confined to one state, nonetheless "affects" interstate commerce. *United States v. Employing Plasterers Association*, 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618 (1954).
*Furlong v. Long Island College Hosp.*, 710 F.2d 922, 925 (2d Cir.1983).

**7.** The complaint in *McLain* contained the following allegations pertinent to establishing federal jurisdiction:
 (1) that the activities of the respondents are "within the flow of interstate commerce and have an effect upon that commerce";
 (2) that the services of respondents were employed in connection with the purchase and sale of real estate by "persons moving into and out of the Greater New Orleans area";
 (3) that respondents "assist their clients in securing financing and insurance involved with the purchase of real estate in the Greater New Orleans area," which "financing and insurance are obtained from sources outside the State of Louisiana and move in interstate commerce into the State of Louisiana through the activities of the [respondents]"; and
 (4) that respondents have engaged in an unlawful restraint of "interstate trade and commerce in the offering for sale and sale of real estate brokering services."
*McLain*, 444 U.S. at 235–36, 100 S.Ct. at 506.

outlined in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), which has been applied in the antitrust context," *Furlong,* 710 F.2d at 927 (citing *McLain,* 444 U.S. at 246, 100 S.Ct. at 511), neither *Conley* nor *McLain* allows "conclusory statements to substitute for minimally sufficient factual allegations," *id.* Rather, "a plaintiff must allege sufficient facts concerning the alleged violation and its likely effect on interstate commerce to support an inference that the defendants' activities infected by illegality either have had or can reasonably be expected to have a not insubstantial effect on commerce." *Id.* at 926. We went on to say in *Furlong,*

> a more detailed pleading requirement . . . obliges a plaintiff to give some thought to the theory of his case, thought that may well reveal to him that he does not, after all, have a case worth pursuing in a federal jurisdiction; it also obliges his attorney to reckon with the "good ground" standard of Fed.R.Civ.P. 11 when he endeavors to plead factual allegations.

*Id.* at 928.

Against these standards, Plaintiffs' original complaint, their complaint amended once as a matter of course, their complaint amended by leave of court, and their proposed amended complaints, are all plainly lacking. None of these pleadings asserts "any facts from which it is inferable that the defendants' activities, infected with the particular illegality alleged, are likely to have a substantial effect on [interstate] commerce." *Id.* at 927. Plaintiffs' original complaint asserts:

> [ (1) ] defendants . . . have contracted, combined, and conspired to restrain trade and . . . have formed an unlawful combination to monopolize a part of trade or commerce among the states in violation of the dormant Commerce Clause of the U.S. Constitution and of 15 U.S.C. §§ 1, 2. By

such activities defendants have acted to exclude the plaintiffs from competition in providing lined landfill disposal services to customers residing in the member municipalities which form the Central Vermont Solid Waste Management District[;]

> [ (2) ] [t]he actions of defendants constitute an unlawful contract, combination or conspiracy in the form of a trust or otherwise in restraint of trade or commerce among the several states in violation of 15 U.S.C. § 1[; and]

> [ (3) ] [t]he actions of defendants constitute an unlawful monopolization, attempt to monopolize, or a combination or conspiracy to monopolize solid waste disposal of any municipal solid waste generated within the member towns of the District, thus monopolizing a part of trade or commerce among the states in violation of 15 U.S.C. § 2 . . . . [8]

Even after the District and C.V. Landfill, on March 8, 1993, had moved to dismiss the antitrust claims for failure to allege facts sufficient to support an inference of a not insubstantial effect upon interstate commerce, Plaintiffs did not seek to amend their complaint so as to remedy this deficiency. All they did, on March 22, 1993, along these lines was amend introductory paragraph 2 of the complaint to read:

> Accordingly, the plaintiffs seek *a declaratory judgment declaring unlawful and/or unconstitutional, and* an order to prevent the defendants from enforcing, relevant provisions of a contract, ordinance, and rules and regulations by which this unlawful restraint *of interstate commerce* and of competition is effectuated, plus *damages,* treble damages, and reasonable litigation costs and attorney's fees.

(amendments emphasized).[9] But, as we have indicated, mere bald assertions that defen-

---

**8.** The district court viewed this third allegation, paragraph thirty-two of the complaint, as the sole suggestion that the District's and C.V. Landfill's activities have any nexus to interstate commerce. The district court found, however, and we agree, that

> this . . . allegation does no more than identify a relevant local activity and "presume an interrelationship with some unspecified aspect of interstate commerce." *McLain,* 444 U.S. at

242, 100 S.Ct. at 509. It does not support and plaintiffs have not plead[ed] any facts to support an inference that the local activity has a "not insubstantial effect" on interstate commerce.

**9.** Nor did Plaintiffs' subsequent proposed amended complaints of June 3 and June 7, 1993, add any factual allegations that would satisfy antitrust jurisdictional requirements.

dants' activities restrain interstate commerce generally, along with references to statutory language, are not substitutes for concrete allegations from which a not insubstantial effect on interstate commerce can be inferred.[10] *E.g., Furlong,* 710 F.2d at 926–27; *see Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 736 (9th Cir.1987) (" 'The pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts 'do not at least outline or adumbrate' a violation of the Sherman Act, the plaintiffs 'will get nowhere merely by dressing them up in the language of antitrust.' ' " (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984) (quoting *Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 654 (7th Cir.1984)), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985))). We agree with the district court's finding that, "despite the fact that plaintiffs have amended their complaint twice and seek to amend it again, they have never sought to amend so as to plead facts sufficient to support an antitrust claim."

Notwithstanding this basic deficiency, Plaintiffs argue that they established antitrust jurisdiction by introducing, during the March 11, 1993, hearing on their motion for preliminary injunction, evidence that the District's and C.V. Landfill's activities have had a not insubstantial effect on interstate commerce.[11] At that hearing, Plaintiffs called Scott Bennett, General Manager of Palisades Landfill, to testify. He stated, *inter alia,* that the lined landfill, in its daily operations, (1) uses equipment manufactured outside of the State of Vermont, (2) purchases fuel from New Hampshire suppliers, and (3) obtains credit from sources in Georgia and Kentucky. Furthermore, he testified that, in constructing the lined landfill, (1) the native Vermont

soil was mixed with bentonite—pursuant to contracts with Illinois and New York companies—which is a naturally occurring clay found in Wyoming, (2) the plastic liner for the landfill was provided by an Illinois company, and (3) quality control was handled by a company out of New Hampshire. According to Bennett, the lined landfill does not generate sufficient revenues to pay the approximately $2,500,000 owed to out-of-state suppliers, contractors, and financiers who participate in the operation and assisted in the development of the lined landfill. He attributed the revenue shortfall to the inability of trash haulers in the District—who are subject to the Flow Control Ordinance and the rules and regulations adopted thereunder—to take solid waste generated within the District to facilities located outside of the District, such as Palisades Landfill's lined landfill. Moreover, Bennett testified that, because of the revenue shortfall, the lined landfill has been unable to secure additional credit, which could be used to satisfy the $2,500,000 obligation.

■ Why Plaintiffs never amended their complaint to refer tersely to these matters is a mystery. Enough could easily have been asserted concerning the alleged violation and its effect on interstate commerce to withstand a motion to dismiss for failure adequately to plead antitrust jurisdiction. *See, e.g., Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 744, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976) (holding that acts that affect an intrastate business's ability to purchase out-of-state supplies, generate out-of-state revenues, and secure out-of-state financing provide a sufficient basis for establishing Sherman Act jurisdiction). But, for reasons already discussed, the complaint, as it now stands, does not satisfy jurisdictional

---

**10.** The inadequacy of Plaintiffs' allegations here becomes even more apparent when compared with the jurisdictional allegations made by the plaintiffs in *McLain, see supra* note 7, and by the plaintiff in *Furlong.* In the latter case,

> [t]o establish that her claim was cognizable under federal antitrust law, Dr. Furlong alleged several connections between the parties' business activities and interstate commerce. The connections specified were Dr. Furlong's receipt of third-party payments from out-of-state, [Long Island Anesthesiology Associates']

receipt of such payments, LIAA's practice of purchasing goods and services in interstate commerce, and [Long Island College Hospital's] receipt of federal subsidies.

*Furlong,* 710 F.2d at 924.

**11.** Plaintiffs asserted in their March 11, 1993, Memorandum in Opposition to Defendants' Motions to Dismiss that they would show at the March 11, 1993, "preliminary injunction hearing that the jurisdictional threshold for the application of the [Sherman Act] is met here."

pleading requirements. Nor was the complaint's deficiency cured by the testimony at the March 11, 1993, hearing. While once allegations of an effect on interstate commerce are controverted, "the plaintiff must 'demonstrate' an interstate effect by evidence," Areeda & Hovenkamp, *Antitrust Law* ¶ 232.1, at 295 (1993 Supp.), the Supreme Court has nowhere indicated that plaintiffs have the option of omitting proper factual allegations from the complaint, tendering the relevant assertions, instead, at some later hearing of their own choosing.[12] The Court's statement in *McLain*—that "[t]o establish jurisdiction a plaintiff must allege the critical relationship in the pleadings," 444 U.S. at 242, 100 S.Ct. at 509—cannot be ignored.

We cannot say, therefore, that the court erred in dismissing Counts II and III when, after having ample opportunity, Plaintiffs did not amend their complaint to plead facts indicating the "critical relationship" between the defendants' activities and some aspect of interstate commerce. Still, we are loath to sustain the dismissal with prejudice of the two counts where the record so obviously reflects the means to remedy the pleading deficiency. We vacate the district court's Rule 12(b)(6) dismissal of Counts II and III, and allow Plaintiffs thirty (30) days from the issuance of mandate to file with the district court an amended complaint that is consistent with the principles discussed herein. Should the district court thereafter determine that Plaintiffs have still failed to comply, it may reenter its order dismissing Counts II and III *with prejudice.*

### B.

▮ The district court concluded that Plaintiffs' antitrust claims (Counts II and III) were barred by the doctrine of res judicata—also referred to as claim preclusion.

The district court was unimpressed by Plaintiffs' argument, which they repeat on appeal, that they should be permitted to bring their Sherman Act claims in federal court because the state court, in the earlier proceeding, did not have subject matter jurisdiction over those claims. In response, the district court ruled that, when Dowdell and Palisades Recycling initially decided to challenge the District's actions, they, being in the offensive position, had the choice of proceeding in either state or federal court. Because they made a strategic decision to proceed in state court rather in federal court, the district court determined that Dowdell should not be entitled subsequently to bring his Sherman Act claims in federal court simply because the state court was not the proper forum for his antitrust claims.

Whatever might be said for the district court's approach as an initial proposition, it would seem to be foreclosed by Supreme Court precedent. In *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), the United States Supreme Court considered "whether a state court judgment may have preclusive effect on a [subsequent] federal antitrust claim that could not have been raised in the [earlier] state proceeding." 470 U.S. at 379, 105 S.Ct. at 1331. There, as here, plaintiffs filed their initial suit in state court, but did not allege violations of state antitrust law; nor did they bring contemporaneous federal antitrust actions. Plaintiffs' claims were dismissed. "In March 1980, [plaintiffs] filed a federal antitrust suit in the United States District Court for the Northern District of Illinois based on the same events underlying their unsuccessful state court actions." *Id.* at 376, 105 S.Ct. at 1329. Following proceedings in the district court, the Seventh Circuit, sitting en banc, held, in a plurality opinion, "that a state court judgment bars the subsequent filing of a federal

---

**12.** Plaintiffs have not argued that they can gain relief from Fed.R.Civ.P. 15(b). Rule 15(b) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In any event, we would reject such an argument under present circumstances. The case has yet to go to trial, and we do not think a district court must accept evidence submitted by a plaintiff at a preliminary hearing as automatically amending an inadequate complaint. *Cf.* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1494, at 53 (1990) ("[I]f the issue in fact has not been tried with the consent of the parties, then an amendment to conform to the pleadings will not be permitted no matter when made.").

antitrust claim if the plaintiff could have brought a state antitrust claim under a state statute 'materially identical' to the Sherman Act." *Id.* at 377, 105 S.Ct. at 1330. The plurality found the Illinois Antitrust Act, Ill. Rev.Stat., ch. 38, ¶ 60–3(2) (1981), to be sufficiently similar to the Sherman Act to bar plaintiffs' federal antitrust claims. The Supreme Court granted certiorari and reversed.[13]

The Court first observed:

> The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738. *This statute directs a federal court to refer to the preclusion law of the State in which judgment was rendered.*

*Marrese,* 470 U.S. at 380, 105 S.Ct. at 1331–32 (emphasis added). The Court further noted that, "[w]ith respect to matters that were not decided in the state proceedings, ... claim preclusion generally does not apply where '[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts....' Restatement (Second) of Judgments § 26(1)(c) (1982)." *Id.* at 382, 105 S.Ct. at 1333. Against this backdrop, the Court held that, "[i]f state preclusion law includes this requirement of prior jurisdictional competency, which is generally true, a state judgment will *not* have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts." *Id.* (emphasis in original).

In accordance with *Marrese,* we must determine whether Vermont's doctrine of res judicata, which might otherwise bar claims asserted in a subsequent proceeding, applies when the court that rendered the earlier judgment did not have subject matter jurisdiction over such claims. In *Town of Waterford v. Pike Industries,* 135 Vt. 193, 373 A.2d 528 (Vt.1977), "the Town of Waterford petitioned the Caledonia County (now Superior) Court to permanently enjoin Pike Industries, Inc. ... from operating its plant facilities within the town because of its violation of the town's zoning ordinance, and for the recovery of a fine of $25 for each day during which the defendant had been in violation." *Pike Indus.,* 373 A.2d at 529. In response, Pike "asserted as an affirmative defense that the town could not rely upon the zoning ordinance for its permanent injunction," *id.,* because it was invalid. The trial court, however, "invoking the doctrine of res judicata, ... held that Pike was barred from raising the claim of invalidity." *Id.* It decided that Pike could have litigated the validity of the ordinance previously when the company, in 1970 and 1971, "petitioned the local zoning board of adjustment for a variance for its plant facilities." [14] *Id.*

The Supreme Court of Vermont, in striking the Caledonia Superior Court's decision, allowed Pike to assert its affirmative defense that the zoning ordinance was invalid. It ruled:

> The challenge of the validity of the ordinance for failure to comply with statutory procedures of necessity involved the adjudication of factual issues. Since the board could not adjudicate the validity of the ordinance,[15] the county court, with its limited appellate jurisdiction, could not properly make determinations with respect to these factual matters.[16] *We therefore hold*

---

**13.** For a thorough discussion of *Marrese,* see 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4470, at 443–49 (1993 Supp.).

**14.** "This variance request was denied by the board and an appeal was taken to the Caledonia County Court which affirmed the board's decision." *Pike Indus.,* 373 A.2d at 529. In *L.M. Pike & Son, Inc. v. Town of Waterford,* 130 Vt. 432, 296 A.2d 262 (Vt.1972), the Supreme Court of Vermont affirmed the county court's decision.

**15.** By virtue of Vt.Stat.Ann. tit. 24, § 4473, "[t]he board is precluded ... from invalidating any development plan or bylaw of any municipality or the implementation or enforcement thereof." *Pike Indus.,* 373 A.2d at 529.

**16.** Although Vt.Stat.Ann. tit. 24, § 4472(a) "currently provides for a de novo hearing before the superior court, at the time that Pike took its appeal to the county court this provision was not in effect." *Pike Indus.,* 373 A.2d at 530.

*that, inasmuch as Pike has not had a proper forum in which to challenge the validity of the ordinance, the trial court erred in barring the defendant from raising this issue in the present case.*

*Id.* at 530 (emphasis and footnotes added). We read *Pike Industries* as indicating that Vermont's preclusion law does not foreclose "matters that [another] court lacked jurisdiction to entertain," *Marrese,* 470 U.S. at 383, 105 S.Ct. at 1333. We hold, therefore, that Plaintiffs are not barred by res judicata from bringing their federal antitrust claims in federal district court.

### III.

*Dismissal of Plaintiffs' Dormant Commerce Clause Claim Brought Pursuant to 42 U.S.C. § 1983 (Count I)*

#### A.

The district court ruled that Count I of the complaint, seeking relief only from the District, did not state a claim against C.V. Landfill. Plaintiffs conceded as much in their Supplemental Points of Authority in Support of Preliminary Injunction and in their Memorandum in Opposition to Defendants' Motions to Dismiss. They have not assigned error on appeal to the district court's ruling, which accordingly stands.

#### B.

■ The district court held that Plaintiffs' dormant Commerce Clause claim against the District, brought pursuant to 42 U.S.C. § 1983, is barred by collateral estoppel (*i.e.,* issue preclusion). In *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), the Supreme Court "made clear that issues actually litigated in a state-court proceeding are entitled to the same preclusive effect in a subsequent federal § 1983 suit as they enjoy in the courts of the State where the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 83, 104 S.Ct. 892, 897, 79 L.Ed.2d 56 (1984); *see Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Anderson v. City of New York,* 611 F.Supp. 481, 486 (S.D.N.Y.1985) ("There is no question that state court judgments can have

collateral estoppel effect in subsequent section 1983 proceedings.... To determine the preclusive effect of a state court judgment, we look to the law of the state where the judgment was rendered."). As the allegedly preclusive proceeding here was in a Vermont state court, we must look to the law of Vermont to determine whether Plaintiffs' claim is barred by the judgment entered in the 1992 state court proceeding brought by Palisades Recycling against the District and C.V. Landfill.

In *Trepanier v. Getting Organized, Inc.,* 155 Vt. 259, 583 A.2d 583 (Vt.1990), the Supreme Court of Vermont held that

[collateral estoppel] should be found only when the following criteria are met: (1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

*Trepanier,* 583 A.2d at 587. Plaintiffs argue that, under this test, they should not be collaterally estopped from proceeding with their § 1983 claim. They assert, *inter alia,* that the constitutional issue in this case, while brought under the dormant Commerce Clause, differs from the Commerce Clause claim addressed by the Washington Superior Court because circumstances have changed. We agree.

It has been recognized that "[o]ne of the most difficult problems in the application of [collateral estoppel] is to delineate the issue on which litigation is, or is not, foreclosed by the prior judgment." Restatement (Second) of Judgments § 27 cmt. c (1982). We must "balance our 'desire not to deprive a litigant of an adequate day in court' against 'a desire to prevent repetitious litigation of what is essentially the same dispute.'" *Berlin Convalescent Ctr., Inc. v. Stoneman,* 159 Vt. 53, 615 A.2d 141, 145–46 (Vt.1992) (quoting Restatement (Second) of Judgments § 27 cmt. c (1982)). In deciding whether "essentially the same dispute" is involved in earlier and later

proceedings, the Supreme Court of Vermont has examined several factors set out in the Restatement, namely, whether

> (1) ... there [is] "a substantial overlap" in the evidence and argument between the two proceedings[ ]; (2) ... the "same rule of law" [is] involved in both proceedings[ ]; (3) ... the "pretrial preparation and discovery" in the first proceeding cover the issues in the second proceeding[ ]; and (4) "... the claims involved in the two proceedings [are closely related.]"

*Stoneman,* 615 A.2d at 146 (quoting Restatement (Second) of Judgments § 27 cmt. c (1982)).

Starting with the second and fourth factors first, we observe that the "same rule of law" is involved in both the state and federal proceedings—that is, the principles of the dormant, or negative, Commerce Clause of the United States Constitution—and the claims involved in the two proceedings are closely related. Nevertheless, in view of the changed circumstances since the state court case, we do not think "there is 'a substantial overlap' in the evidence and argument between the two proceedings," *id.,* or that "the 'pretrial preparation and discovery' in the first proceeding cover the [dormant Commerce Clause] issues in the second proceeding," *id.*

The dormant Commerce Clause is a non-textual offshoot of the Commerce Clause, which "ascribes to Congress the power '[t]o regulate Commerce ... among the several States.' U.S. Const. art. I, § 8, cl. 3. Ascription of this power to Congress limits, by negative implication, the power of the States to interfere with interstate commerce." *New York State Trawlers Ass'n v. Jorling,* 16 F.3d 1303, 1307 (2d Cir.1994) (citing *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* —— U.S. ——, ——, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992)). In *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), the United States Supreme Court, in discussing the dormant Commerce Clause, observed that its opinions "through the years have reflected an alertness to the evils of 'economic isolation' and protectionism, while at the same time recognizing that incidental bur-

dens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." 437 U.S. at 623–24, 98 S.Ct. at 2535. In this context, the Court explained that "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected.... But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142[, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).]" *Id.,* 437 U.S. at 624, 98 S.Ct. at 2535. In *Pike,* the Court ruled:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike,* 397 U.S. at 142, 90 S.Ct. at 847; *see Jorling,* 16 F.3d at 1307 ("Provided a state does not discriminate against non-residents, ... it may impose incidental burdens on interstate commerce when exercising its police power to promote safety or general welfare." (citing Laurence H. Tribe, *American Constitutional Law* § 6–5, at 408 (2d ed. 1988) ("State regulation affecting interstate commerce will be upheld if (a) the regulation is rationally related to a legitimate state end, and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation.")).

These principles were relevant when the Washington Superior Court considered Palisades Recycling's dormant Commerce Clause claim and the arguments opposing it. Hence C.V. Landfill, in its state court memorandum in opposition to Palisades Recycling's motion

for a preliminary injunction, maintained that any incidental burden placed on interstate commerce by provisions of the Flow Control Ordinance and the Interim Disposal Agreement was "clearly justified" by the District's need to achieve "health, safety and public welfare objectives." C.V. Landfill explained that the Flow Control Ordinance and the Interim Disposal Agreement gave the District the power to guaranty that facilities with which it contracts will receive a certain quantity of waste. This, in turn, provides those facilities with a steady stream of revenues, which may be used to develop solid waste facilities (*e.g., lined* landfills) needed by the District.[17] Accordingly, in deciding that "[t]he evidence does not establish that the Flow Control Ordinance[,] as applied, violates the Commerce Clause of the United States Constitution," the Washington Superior Court may very well have concluded that, notwithstanding any incidental burdens placed on interstate commerce, there were indeed local benefits to be achieved by allowing the District to require member towns to send trash to one particular *unlined* landfill as opposed to another *unlined* landfill.

In the present case, however, the district court's focus would not be the same because the circumstances are different. First, as Plaintiffs point out, they now operate a *lined* landfill, which they say is environmentally superior to the *unlined* landfill operated by Palisades Recycling. This difference is significant, they contend, because the District and C.V. Landfill can no longer argue that there is any local benefit—that would justify any encumbrance on interstate commerce— to designating C.V. Landfill as the exclusive recipient of solid waste generated within the

District.[18] Plaintiffs submit that, while C.V. Landfill and the District could, in the state case, argue that an ordinance that directs the flow of solid waste to one unlined landfill as opposed to another unlined landfill provides local benefits that justify any incidental burden on interstate commerce, they cannot make that same argument here when solid waste is being directed to one facility to the exclusion of a new and adequate lined landfill. This arrangement, argue Plaintiffs, does not provide local benefits justifying the incidental burden on interstate commerce.

Plaintiffs further point to recent changes in the contract between C.V. Landfill and the District, as well as the Supreme Court's May 1994 decision in *C & A Carbone, Inc. v. Town of Clarkstown,* —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (holding that a flow control ordinance that required all solid waste to be processed at a designated transfer station before leaving the municipality violated the dormant Commerce Clause).[19] Because of these, the Flow Control Ordinance and Interim Disposal Agreement are said to violate *per se* the dormant Commerce Clause: that is, Plaintiffs contend that the ordinance and the agreement operating in conjunction do not merely burden interstate commerce incidentally, but "facially" discriminate against it. In support of this argument, Plaintiffs point to evidence in the record indicating that the State of Vermont shut down C.V. Landfill's unlined landfill as of August 6, 1993, and C.V. Landfill, pursuant to a 1993–94 renewal of the Interim Disposal Agreement, now acts as the exclusive transfer station for solid waste generated within

---

17. Indicative of the District's intent that C.V. Landfill would construct a lined landfill was paragraph 3 of the Interim Disposal Agreement, which read:

During the initial term of this agreement, Operator shall provide disposal capacity (until exhausted or prohibited) for District waste, only at its unlined facility. In anticipation of exhaustion of unlined capacity, Operator will commence to permit and prepare for construction [of] materials processing and long-term disposal facilities consisting of a source separated organic waste composting process and *lined landfill cell ....*
(emphasis added).

18. The district court did not find this distinction compelling. It held that "the fact that the state court action pertained to the unlined landfill and this action pertains to a lined landfill does not alter the Court's opinion that the issues before us, i.e., the legality of the District's actions under state law and the Commerce Clause, are identical to the issues previously contested in state court."

19. The Supreme Court had not yet decided *C & A Carbone* when Plaintiffs submitted their briefs. They cited it, however, as a case that involves facts very similar to those here, and as a decision that could potentially strengthen their dormant Commerce Clause claim.

the District.[20] Moreover, although there is no evidence in the record to this effect, Plaintiffs say they can prove that C.V. Landfill, in its capacity as a transfer station, ships all solid waste generated within the District to a lined landfill in Bethlehem, New Hampshire. According to Plaintiffs, because this new arrangement requires C.V. Landfill to process solid waste generated by the District prior to out-of-state shipment—to the exclusion of all other in-state or out-of-state entities—the Flow Control Ordinance and the Interim Disposal Agreement are protectionist measures that directly violate the dormant Commerce Clause.[21]

Having considered Plaintiffs' current position, the described changed circumstances, and the Supreme Court's ruling in *C & A Carbone,* we do not think the evidence introduced and the arguments made in the state court proceeding can be said to have adequately addressed Plaintiffs' present dormant Commerce Clause claim. Pretrial preparation and discovery in the state case would not have covered the key issues here. We hold that Plaintiffs' present dormant Commerce Clause claim relies on facts that differ so materially from the ones before the Washington Superior Court that Plaintiffs must be allowed to proceed with their claim. *See* 18 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 4417, at 153 (1981) (stating that preclusion is inappropriate when the facts of the second suit are "separable" from the facts of the first suit, and the new facts are distinguishable from the facts found in the first suit "for purposes of the substantive rules applied in the first suit"). We reverse

the district court's ruling that Plaintiffs' § 1983 claim is barred by collateral estoppel.

▪ We add that it is also doubtful—although we do not decide this point—whether there was privity between the state plaintiff, Palisades Recycling, and two of the three present Plaintiffs. The district court found privity because "[Palisades Recycling, Palisades Landfill, and Valley Disposal] are all alter egos of Robert Dowdell."

We have no doubt the district court was correct in finding that Robert Dowdell was in privity with Palisades Recycling. He owned and controlled the company, and freely admitted to initiating and controlling the state court action brought by Palisades Recycling, in which he had a financial stake. Whether, however, Palisades Landfill and Valley Disposal, the current corporate plaintiffs, were also in privity with Palisades Recycling, the state court plaintiff, by virtue of their alter ego relationships with Robert Dowdell is much more dubious.

"The rationale behind the alter ego theory is that if the shareholders themselves, or the corporations themselves, disregard the legal separation, distinct properties, or proper formalities of the different corporate enterprises, then the law will likewise disregard them so far as is necessary...." 1 Charles R.P. Keating & Gail O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10, at 614 (1990). To determine whether the separate existence of the corporation should be disregarded, courts have examined a number of factors, including:

(1) whether the shareholder sought to be charged owns all or most of the stock of the corporation; (2) whether the share-

---

**20.** Indeed, the renewal agreement states:
Paragraph 3. is deleted and is replaced by the following Paragraph 3.:
3. During the first renewed term of this Agreement, Operator shall provide disposal capacity (until exhausted or prohibited) for District waste, only at its unlined facility. In anticipation of exhaustion or prohibition of unlined capacity, Operator will continue its efforts to permit and prepare for construction of a materials processing and long-term disposal facility consisting of a lined landfill cell.... If Operator is prohibited by law from disposal of solid waste at its unlined facility, and in any event at a time no later than Octo-

ber 9, 1993, Operator will provide the District transfer services to a lined facility, effective immediately upon closure of the unlined facility....

**21.** Plaintiffs described these new events and this new claim, among others, in their proffered amended complaint of June 7, 1993. The district court disallowed the amendment, apparently believing that its dismissal of the complaint as earlier amended rendered the new claim moot. Upon remand, the district court is instructed to allow Plaintiffs' to amend their complaint to include their updated allegations and claims.

holder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (3) whether the corporation has grossly inadequate capital; (4) whether the shareholder uses the property of the corporation as his own; (5) whether the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; and (6) whether the formal legal requirements of the corporation are observed.

*Id.* § 41.10, at 616. As to the first consideration, the record reveals that Robert Dowdell solely owns Palisades Recycling and jointly owns Palisades Landfill and Valley Disposal. But as to the remaining factors, the record is relatively silent. While additional evidence might reveal that the corporate plaintiffs here and Palisades Recycling are indeed the alter egos of Robert Dowdell, we doubt whether the record, in its present state, supports such a finding.[22] We need not, however, rule finally, as, even assuming privity, the issues are, as we have found, too dissimilar to support a determination of collateral estoppel.

## IV.

### *Dismissal of Plaintiffs' State Law Claims (Counts IV & V)*

#### A.

██  The district court thought it was unclear from Plaintiffs' complaint whether they were bringing their supplemental state law claims (Counts IV and V) against C.V. Landfill or solely against the District. To the extent that the claims were brought against

C.V. Landfill, the district court declined to retain jurisdiction, having already dismissed the federal antitrust claims. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."). By vacating the district court's decision to dismiss Plaintiffs' federal antitrust claims, however, *see supra* part II.A, we have eliminated the grounds upon which the district court dismissed Plaintiffs' supplemental state law claims. Accordingly, we vacate the judgment dismissing Plaintiffs' state law claims against C.V. Landfill so that the district court may, in its discretion, exercise supplemental jurisdiction. *See Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir.1993) ("The decision whether to exercise pendent jurisdiction is within the discretion of the district court.").

#### B.

██  Finding that Palisades Recycling brought the same claims in the earlier state court proceeding, the district court dismissed Plaintiffs' supplemental state law claims (Counts IV and V) against the District on the grounds that they were barred by collateral estoppel. Plaintiffs argue that the district court's decision must be reversed because the issues involved in the supplemental state law claims in this case are not the same as the questions put before the Washington Superior Court. Although Plaintiffs conceded below in their Memorandum in Opposition to Issue Preclusion that "there is [a] similarity in some of [the] issues at bar with those

**22.** Were the district court free to write on a clean slate, it might have relied on a theory other than the alter ego doctrine to satisfy the first element of Vermont's *Trepanier* test (*i.e.,* "preclusion is asserted against one who was a party or in privity with a party in the earlier action," 583 A.2d at 587). While the traditional test for privity—"whether the parties have really and substantially the same interest in the property in issue," *First Wis. Mortgage Trust v. Wyman's, Inc.,* 139 Vt. 350, 428 A.2d 1119, 1124 (Vt.1981)—might not have yielded any clear result one way or other, the district court might have looked to "[s]ome recent decisions [that] have stretched traditional doctrine and allowed collateral estop-

pel to be used against nonparties in some situations," Hiroshi Motomura, *Using Judgments as Evidence,* 70 Minn.L.Rev. 979, 1026 (1986). The "virtual representation" doctrine, for example, which says "that a nonparty is bound if a party who had the same interests litigated the prior case, even though the nonparty was neither a participant nor in privity with a party in the prior proceeding," *id.* at 1029, might apply if it were found "that . . . two corporations were taking advantage of their corporate separateness in order to sue [the same defendant] twice," *American Renaissance Lines, Inc. v. Saxis S.S. Co.,* 502 F.2d 674, 678 (2d Cir.1974).

brought in the earlier litigation such as claims that the District's actions are *ultra vires,*" they maintain that the *ultra vires* analysis changes when the claimant is an operator of a lined landfill as opposed to an operator of an unlined landfill. We agree with Plaintiffs.

Pursuant to Vermont law, "[m]unicipalities are responsible for the management and regulation of the storage and collection of solid wastes within their jurisdiction in conformance with the state solid waste management plan authorized under chapter 159 of Title 10." [23] Vt.Stat.Ann. tit. 24, § 2202a(a) (Supp. 1991). Chapter 159 of Title 10 contains several provisions pertaining to lined and unlined landfills. While we do not describe them all, one provision, for instance, states that "[n]ew landfills placed in operation after July 1, 1987[,] shall be lined and shall collect and treat leachate." Vt.Stat.Ann. tit. 10, § 6605(d) (Supp.1992). Others provide:

(c) No later than July 1, 1991[,] the operating portion of each landfill shall be lined, if required under the provisions of 10 V.S.A. § 6605(d), except that those in operation as of July 1, 1987[,] that are certified to receive or actually receive less than 1,000 tons of municipal waste per year may be exempted from this requirement· according to the provisions of subsection (d) of this section, or if, considering the factors established in subdivision (a)(3) of this section, the secretary finds that they will not create a significant risk to public health and that they will not cause irreparable harm to the environment.

(d) The secretary [of the agency of natural resources] may authorize continued operation of a municipally owned unlined landfill which is in operation on July 1, 1992[,] and which will receive less than 1000 tons per year of waste for disposal. . . .

Vt.Stat.Ann. tit. 10, § 6605a(c), (d) (Supp. 1992). Another provision requires the secre-

tary, under certain circumstances, to "extend to July 1, 1992[,] the period for operating and closing an unlined landfill that has capacity available through July 1, 1992." Vt.Stat.Ann. tit. 10, § 6605c(b) (Supp.1992). Moreover, the secretary could, upon making certain findings, issue, until December 31, 1992, landfill extension orders "for the purpose of extending the July 1, 1992[,] landfill closure date for existing, operating, unlined landfills receiving waste as of January 1, 1992. This extension [could] run until October 9, 1993." Vt.Stat.Ann. tit. 10, § 6605e(a) (Supp.1992). The prerequisite findings for such an extension order includes, *inter alia,* a determination

(1) that the continued use of the unlined facility is necessary. Before finding that continued use of an unlined facility is necessary, with respect to a facility qualifying for an exemption under subdivision (a)(2) of this section, *the secretary shall first find that the planning entity lacks a lined landfill alternative that is reasonably available.*

Vt.Stat.Ann. § 6605e(b)(1) (Supp.1992) (emphasis added).

These statutes indicate that the Vermont General Assembly wished to promote the development and operation of lined landfills. A court deciding Plaintiffs' present claims must, therefore, consider whether the District's actions, which allegedly adversely affect Dowdell's and Palisades Landfill's *lined* landfill, are *ultra vires;* that is, whether they exceed the powers conferred upon it by the Vermont laws cited above and others. The Washington Superior Court, which considered the impact of the District's action on *unlined* landfills, did not address this same issue. Indeed, the state court concluded that the District's actions were not *ultra vires* because its "contract with C.V. Landfill, Inc. . . . . do[es] not go beyond the District's grant of authority concerning its ability to

---

**23.** Chapter 159 is entitled "Waste Management," and its purpose is to

provide technical and financial leadership to municipalities for the siting of solid waste management facilities and the implementation of a program for the management and reduction of wastes that over the long term is sustainable, environmentally sound, and economi-

cally beneficial, and that encourages innovation and individual responsibility. The program should give priority to reducing the waste stream through recycling and through the reduction of non-biodegradable and hazardous ingredients.

Vt.Stat.Ann. tit. 10, § 6601(5) (Supp.1992).

assess and recover a surcharge on solid waste disposed of within the District." Therefore, because the issues underlying Plaintiffs' supplemental state law claims in this case differ from those presented in the previous state case, the district court's decision that Plaintiffs are barred by collateral estoppel from asserting Counts IV and V of their complaint must be reversed.

## V.

### *Are Plaintiffs Entitled to Partial Summary Judgment on Count I for Declaratory and Injunctive Relief?*

■ In the proceedings below, Plaintiffs[24] countered the District's motion for summary judgment, which sought dismissal of Plaintiffs' claims on the grounds of res judicata and collateral estoppel, with their own cross-motion for partial summary judgment on Count IV and on their § 1983—dormant Commerce Clause—claim (Count I). The district court, having decided to grant the District's motion, did not reach the merits of Plaintiffs' cross-motion, dismissing it as moot. Now that we have reversed the district court's preclusion rulings, Plaintiffs ask us to enter summary judgment in their favor on their dormant Commerce Clause claim. We decline to do so. Instead, we remand the issue to the district court so that it may decide the merits of Plaintiffs' motion. *Cf. Hotel & Restaurant Employees Union Local 217 v. J.P. Morgan Hotel,* 996 F.2d 561, 568 (2d Cir.1993) (observing that, where a plaintiff's motion for summary judgment was denied as moot in light of the district court's dismissal of the complaint for lack of subject matter jurisdiction, the ordinary procedure, upon reinstatement of the complaint, is to remand the issue to the district court so that it may "have an opportunity to rule on the merits of the motion" (citing *Cruden v. Bank of New York,* 957 F.2d 961, 978 (2d Cir.1992) and *Goetz v. Windsor Central School District,* 698 F.2d 606, 610 (2d Cir.1983))).

## CONCLUSION

In accordance with the discussion herein, we (1) vacate the district court's decision

granting C.V. Landfill's motion to dismiss Counts II and III (*i.e.,* the federal antitrust claims) for failure to state a claim upon which relief can be granted, and we remand these claims for further proceedings consistent with this opinion; (2) do not disturb the district court's ruling that C.V. Landfill's motion to dismiss Count I (*i.e.,* the dormant Commerce Clause claim brought pursuant to § 1983) is moot because Count I asserts a claim only against the District; (3) vacate the district court's decision granting C.V. Landfill's motion to dismiss Counts IV and V (*i.e.,* the state law claims) for lack of subject matter jurisdiction; (4) reverse the district court's decision granting the District's motion for summary judgment as to Counts II and III on res judicata grounds; (5) reverse the district court's decision granting the District's motion for summary judgment as to Counts I, IV, and V on collateral estoppel grounds; and (6) vacate the district court's ruling that Plaintiffs' cross-motion for partial summary judgment as to Count I is moot so that the district court may have an opportunity to rule on the merits of this motion.

*So ordered.*

---

**24.** Valley Disposal was actually specified as the moving party.