# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MORRIS, ARGUELLES,[1] and JUETTEN
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Second Lieutenant RICKY A. SMITH**
**United States Army, Appellant**

ARMY 20230482

Headquarters, Fort Bragg
G. Bret Batdorff, Military Judge
Colonel Joseph B. Mackey, Staff Judge Advocate

For Appellant: Lieutenant Colonel Autumn R. Porter, JA; Lieutenant Colonel Robert D. Luyties, JA (on brief); Colonel Frank E. Kostik, Jr., JA; Lieutenant Colonel Kyle C. Sprague, JA; Major Peter M. Ellis, JA (on reply brief).

For Appellee: Colonel Richard E. Gorini, JA; Major Stephen L. Harmel, JA; Captain Andrew T. Bobowski, JA; Mitchell Taylor, law student (on brief).

30 December 2025

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ARGUELLES, Judge:

An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of failure to obey a written order, one specification of maltreatment, one specification of conduct unbecoming an officer, and two specifications of indecent conduct, in violation of Articles 92, 93, 133, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 893, 933, and 934 [UCMJ].[2] The panel acquitted appellant of one specification of making a false

---

[1] Judge ARGUELLES decided this case while on active duty.

[2] For purposes of clarity and efficiency, subsequent reference to the UCMJ will exclude citation to that work.

official statement and two specifications of sexual assault, in violation of Articles 107 and 120. The panel sentenced appellant to a dismissal and forfeiture of $2,521 per month for six months. The convening authority took no action on the sentence.

This case is before the court for review pursuant to Article 66. Appellant raises five assignments of error, one of which (factual sufficiency of the maltreatment specification) merits relief.[3]

## BACKGROUND

On 3 April 2022, appellant, a second lieutenant (O-1), and the victim, a specialist (E-4), attended a barbecue together while both were forward deployed to Mihail Kogalniceanu Airbase ("MK Airbase") in Romania. Appellant and the victim were members of the same unit, but there were also soldiers from other units present at the barbecue. The victim testified, and appellant confirmed in his interview with the Army Criminal Investigative Division (CID), that prior to the barbecue, the two had limited professional interactions and did not speak more than a sentence to each other while working.

Officers, enlisted, and noncommissioned officers (NCOs) attended the barbecue, where both appellant and the victim were drinking. There is no evidence, however, that appellant and the victim drank together or had any interaction during the barbecue. While soldiers from other units present at the barbecue were authorized to consume alcohol, appellant and the victim's unit was subject to an order prohibiting the consumption of alcohol while deployed on MK Airbase.

The party ended around 2100 when the victim slapped an NCO who was also attending the party, and one of the partygoers called the victim's friends to come get her because she was "out of control." After the party broke up but before the victim's friends arrived, witnesses observed appellant and the victim side by side, giggling and laughing together in the shack that had housed the party. One of the witnesses testified that when he asked if they were okay and if "everything's good," both appellant and the victim responded that "yes, everything was good."

In an interview admitted into evidence, appellant told CID that he sat with the victim for a few minutes after her altercation with the NCO to calm her down, and that when he tried to leave, she pulled him in for a kiss. Several soldiers observed them in the shack, and appellant and at least one other soldier said the victim was lying next to him on the ground while fully clothed.

---

[3] We have also given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

2

At some point, appellant and the victim left the shack, whereupon the victim announced that she needed to use the restroom and initially attempted to access the latrine in the nearby men's barracks. Appellant and another soldier were able to keep her from entering the male barracks. Appellant and the victim then headed across the way towards the public latrine and showers located in a Morale Welfare and Recreation (MWR) facility. These restrooms were open and remained accessible and unlocked 24 hours a day.

Appellant told CID that after arriving at the MWR latrines, he went to the male restroom and the victim went to the female restroom. Appellant used the restroom and exited the bathroom to wait for the victim. After appellant waited a few minutes for the victim by the female door, she opened the door and pulled him into the female restroom, which contained both toilets and a shower area in the rear. Per appellant, the two kissed and then the victim led him around the room, performing oral sex on him both in the open part of the room by the sinks and back in the enclosed shower area. Appellant also described how at one point by the door, the victim lowered her pants and guided his penis into her vagina.

During the interview, appellant described how the victim put her hand by the door and was playing with the lock but then specifically said, "she never even locked it." Although not entirely clear from the videotape of his interview, it appears appellant then said something along the lines of "anyway she was locking it." At no point during his interview, however, did appellant assert that he knew for certain whether the victim had locked the door or that he had relied on the victim's alleged locking of the door as a justification for his conduct in the latrine. Finally, appellant asserted that all of the sexual activity was fully consensual and described how the victim took a leading role throughout the encounter.

The victim, at trial, provided a different account of events. The victim testified that, based on the facts that she did not eat anything during the day and the amount of alcohol she drank at the barbecue, she had no memory of what happened shortly after arriving at the barbecue, including her altercation with the NCO. She asserted that her only recollection after arriving at the barbecue was "a faint memory of being pinned up against the wall, and being kissed on, in the bathroom." Neither side asked the victim if she recalled anything about the lock.

As described above, after the victim slapped the NCO, one of the partygoers called her female friends to come get her. By the time three of the victim's friends responded to the shack, the victim was no longer there. Unable to find her, the friends testified as to how they were growing increasingly worried. Finally, they ran into another soldier who told them that he saw appellant and the victim heading towards the MWR restrooms. The first friend who entered the restroom testified that after she heard someone say "oh f***" in the back showers, she went into the shower area where she saw a male "hovered over" a female with his pants down and his

3

buttocks exposed. That soldier immediately ran out of the restroom and was "crying hysterically" when she reported to her friends still outside that "somebody's in there having sex." Two more members of the search party entered and saw appellant standing in the corner of the shower with the victim "like on her knees."

One of the female soldiers then helped the victim wash her face and led her outside, where she joined the others. A few minutes after that, appellant walked out of the female restroom, where one of the female soldiers took a picture of him on her phone. From there, all the females returned to the party shack to look for the victim's phone. Following along, appellant was able to find the victim's phone using the flashlight on his phone. After that, all of the females and appellant went to the on-post dining facility (DFAC), but when appellant tried to sit with the girls, they told him they wanted to be alone, and he returned to his barracks room.

There was conflicting testimony about the victim's level of intoxication, both at the party and after her friends found her in the MWR latrine. After the female soldiers returned to the female barracks, one of the witnesses testified that the victim was a "happy drunk" and was joking about "popping champagne" after another soldier dropped a soda that sprayed everywhere. Another one of the female soldiers testified that when she asked the victim back in the barracks if appellant took advantage of her, the victim responded, "[N]o, he is my friend." Sometime after arriving back at the barracks, the victim went back to the MWR latrine to call a male soldier who was stateside.

The victim testified that based on "what was being told to me" by her friends the next day and the fact that she "could tell the next morning that something had been inside of me," she reported to her first sergeant that "I thought I'd been assaulted."

Based on his attendance at the barbecue and his interaction with the victim that night, appellant was charged with two specifications of Article 120 (sexual assault on a victim incapable of consenting due to alcohol), two specifications of Article 134 (indecent conduct for penetrating the victim's vulva and mouth in an unlocked latrine), one specification of Article 93 (maltreatment for kissing the victim), one specification of Article 92 (failure to obey a lawful order prohibiting him from drinking alcohol), one specification of Article 133 conduct unbecoming (consuming alcohol with enlisted soldiers in a deployed environment), and one specification of Article 107 (false official statement for telling CID that the victim was "good to go" and "in her right state" on the night in question). As noted above, the panel acquitted appellant of the two sexual assault specifications and the false official statement specification but found him guilty on all of the other charges and specifications.

4

## LAW AND DISCUSSION

### A. Indecent Conduct Specification

Charge II set forth two specifications alleging indecent conduct: (1) appellant penetrated the victim's vulva with his penis in an unlocked latrine; and (2) appellant kissed the victim in an unlocked latrine. Appellant now claims that his conviction for indecent conduct is factually and legally insufficient because he took affirmative steps to be behind multiple closed doors, did not disrobe, and picked a location further away from other soldiers. For the reasons set forth below, this claim is without merit.

### 1. Law – Factual Sufficiency

Article 66(d)(1)(B), Factual Sufficiency Review, provides:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.

> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

>> (II) appropriate deference to findings of fact entered into the record by the military judge.

> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

The Court of Appeals for the Armed Forces [CAAF] addressed the application of Article 66(d)(1)(B) in *United States v. Harvey*, 85 M.J. 127 (C.A.A.F. 2024). First, the CAAF held that if the two "trigger conditions (i.e., an assertion of an error and a showing of a deficiency) are not met, then nothing in amended Article 66, UCMJ, either requires or allows [this court] to review the factual sufficiency of the evidence." *Id.* at 130.

To date, the CAAF has not provided any additional guidance on what constitutes the second *Harvey* trigger of a "showing of deficiency in proof." In its most recent discussion of factual sufficiency, the CAAF did not delve into what constitutes a showing of deficiency of proof, but rather only generally held that

"when stating the standard of review and performing factual sufficiency review, service courts should cite and follow this Court's guidance in *Harvey*, 85 M.J. at 130-32, instead of the Court's prior guidance in" *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). *United States v. Downum*, __ M.J. __, 2025 CAAF LEXIS 828, at *13 (C.A.A.F. 30 Sept. 2025).

In *United States v. Brassfield*, we held that the combination of appellant's testimony denying the conduct at issue, along with "minor inconsistencies in the victims' testimony does *not* establish a specific deficiency of proof" under *Harvey*. 85 M.J. 523, 528 (Army Ct. Crim. App. 2024) (emphasis added), pet. denied, 85 M.J. 446 (C.A.A.F. 2025); *see also United States v. Myers*, ARMY 20230100, 2024 CCA LEXIS 535, at *14 (Army Ct. Crim. App. 16 Dec. 2024) (mem. op.) (appellant fails to make a specific showing of deficiency in proof where "indisputable" facts established his guilt), pet. denied, 85 M.J. 405 (C.A.A.F. 2025).

Addressing the same issue, our sister court in *United States v. Valencia* held:

> a general disagreement with a verdict falls short of a specific showing of a deficiency in proof, and thus [under *Harvey*] will not trigger a full factual sufficiency analysis. Rather, an appellant must identify a weakness in the evidence admitted at trial to support an element (or more than one element) and explain why, on balance, the evidence (or lack thereof) admitted at trial contradicts a guilty finding.

85 M.J. 529, 535 (N.M. Crim. Ct. Crim. App. 2024), aff'd, 2025 CAAF LEXIS 966 (C.A.A.F. 24 Nov. 2025); *see also United States v. Penaloza*, ARMY 20230473, 2025 CCA LEXIS 76, at *14 (Army Ct. Crim. App. 28 Feb. 2025) (mem. op.) (fact negating element of offense satisfies the second *Harvey* trigger).

We will adopt a combination of our holding in *Brassfield* and our sister court's holding in *Valencia* as guideposts for meeting that standard. Assuming the trigger conditions are met, the CAAF construed the requirement of "appropriate deference" to imply "that the degree of deference will depend on the nature of the evidence at issue," and held that Article 66 "affords the [Court of Criminal Appeals (CCA)] discretion to determine what level of deference is appropriate . . . ." *Harvey*, 85 M.J. at 130-31. Explaining, the CAAF in *Harvey* held:

> For example, a CCA might determine that the appropriate deference required for a court-martial's assessment of the testimony of a fact witness, whose credibility was at issue, is high because the CCA judges could not see the witness testify. In contrast, when the CCA can assess documents,

> videos, and other objective evidence just as well as the
> court-martial, the CCA might determine that the
> appropriate deference required is low. The statute affords
> the CCA discretion to determine what level of deference is
> appropriate, and we will review a CCA's decision only for
> an abuse of discretion.

*Id* at 131. Finally, with respect to the last part of the analysis, the CAAF held "the quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is 'proof beyond a reasonable doubt,' the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* The CAAF concluded:

> Accordingly, for a CCA to be "clearly convinced that the
> finding of guilty was against the weight of the evidence,"
> two requirements must be met. First, the CCA must decide
> that the evidence, *as the CCA has weighed it*, does not
> prove that the appellant is guilty beyond a reasonable
> doubt. Second, the CCA must be clearly convinced of the
> correctness of this decision.

*Id.* at 132 (emphasis in original).

### 2. Law – Legal Sufficiency

With respect to legal sufficiency, our review is de novo. *United States v. Robinson*, 77 M.J. 294, 297 (C.A.A.F. 2018) (citation omitted). "'The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 297-98 (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). Because we must draw "every reasonable inference from the evidence of record in favor of the prosecution[,]" the standard for legal sufficiency "involves a very low threshold to sustain a conviction." *United States v. Smith*, 83 M.J. 350, 359 (C.A.A.F. 2023) (first quoting *Robinson*, 77 M.J. at 298; and then quoting *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019)).

### 3. Law – Indecent Conduct

In *United States v. Izquierdo*, the CAAF held that consensual sexual acts committed "openly and notoriously" are actionable offenses under Article 134 indecent conduct. 51 M.J. 421, 422 (C.A.A.F. 1999) (citations omitted). The CAAF further held that the military judge properly instructed the members that "[s]exual acts are considered to be committed openly and notoriously when such acts are performed in such a place and under such circumstances that it is reasonably likely to be seen by others even though others actually do not view the acts." *Id.* at 423.

7

In *Izquierdo*, the CAAF specifically held that while hanging up a sheet to have sex with others still present in the room was legally sufficient to sustain a conviction for indecent conduct, having sex in an unlocked barracks room where no one else was present was legally insufficient. *Id.*

In *United States v. Sims*, the CAAF reaffirmed the holding of *Izquierdo*—that it was not necessary to prove that a third person actually observed the indecent act, but rather only that it was reasonably likely that a third person would observe it. 57 M.J. 419, 422 (C.A.A.F. 2002). In *Sims*, the CAAF held that where the conduct occurred in a private bedroom with no one else present and neither party disrobed, appellant's guilty plea to an indecent conduct specification was improvident. *Id.*; *see also United States v. Castellano*, 72 M.J. 217, 222 (C.A.A.F. 2013) ("Whether consensual sexual activity between adults is subject to criminal sanction because it is 'open and notorious' – i.e., public as opposed to private under this Court's case law – is a factual determination committed to the trier of fact." (citations omitted)); *United States v. Rollins*, 61 M.J. 338, 344 (C.A.A.F. 2005) ("The determination of whether an act is indecent requires examination of all the circumstances, including the age of the victim, the nature of the request, the relationship of the parties, and the location of the intended act." (citation omitted)).

*4. Analysis*

Appellant argues that because at least some of the sexual activity occurred in the shower (which was located behind another wall of the latrine), he and the victim did not fully disrobe, and that there was "no substantial risk" of discovery by others, the indecent conduct specification is factually insufficient.

Appellant's attempt to draw parallels between this case and *Izquierdo* and *Sims* fails for several reasons. First, having sex in a public MWR latrine is simply not the same thing as having sex in an unlocked private barracks. *See United States v. McLeod*, 67 M.J. 501, 504 (C.G. Ct. Crim. App. 2008) ("[S]exual conduct that occurred in a military chapel – a public building on a military installation that provides unrestricted access to military members . . . ." is "open and notorious"). Moreover, and again unlike both *Izquierdo* and *Sims*, in this case a third party did actually walk into the latrine, where she observed appellant with his pants down, buttocks exposed, and hovering over the victim. Put simply, we do not need to determine whether appellant and the victim's sexual activity in the latrine "was reasonably likely to be seen by others," because said activity was in fact observed by one of the female soldiers looking for the victim when she walked in on them in the shower.

Appellant also argues that his conviction is factually and legally insufficient because he "believed he was behind a locked door." This contention, however, lacks evidentiary support. To the contrary, although during his recorded interview

8

appellant made some references to the victim playing with the lock and/or having her hands near the lock, he never claimed he knew she locked the door. Nor did he ever expressly or even implicitly assert that he relied on her locking the door as a justification for his conduct in the latrine.

Based on this record, appellant has not even met the threshold "showing of a deficiency" to trigger our Article 66 review. Specifically, appellant has failed to show either: (1) that the female MWR latrine was so "private" as to undermine the panel's implicit finding that his conduct was "open and notorious" conduct; or, (2) that his belated justification that the victim locked the door is a "weakness in the evidence" that contradicts the panel's guilty finding.[4]

For all of the same reasons, his indecent conduct conviction is also legally sufficient.

### B. Failure to Obey Lawful Order Specification

Appellant now claims that his conviction for failing to obey a lawful written order by drinking alcohol on-post is factually insufficient. Specifically, appellant asserts that the command modified the order, the order had exceptions and an unclear timeframe, and that there were multiple different understandings from those who received the order. For all of the reasons set forth below, we disagree.

### 1. Additional Facts

On 9 February 2022, the commander of appellant's unit issued a formal written order that provided, in pertinent part, "Soldiers shall not consume, purchase, possess, manufacture, distribute, import or export any alcohol while deployed." Multiple witnesses testified at trial that at some point the commander relaxed the order so that soldiers in appellant's unit could drink two or three alcoholic beverages at pre-approved restaurants *off-post*. The unit's first sergeant testified soldiers who drank off-post under the relaxed order had to go out in a "mingle of both officers and enlisted." Further clarifying, the first sergeant explained:

> it couldn't be a bunch of E5s and E6s just going out with
> their Joe's consume – having dinner and consuming two
> drinks. You had to have somebody there that, that they

---

[4] Even assuming that appellant has satisfied the second *Harvey* trigger, his factual insufficiency claim is still without merit. After giving the appropriate level of deference to the panel members who saw and heard the witnesses as they testified, we are clearly convinced, based on our own review and weighing of all the evidence in the record of trial, that appellant was guilty of indecent conduct beyond a reasonable doubt.

thought was responsible enough to be able to, I wouldn't
say micromanage, but be able to make sure that
everybody's following the two-drink rule.

Likewise, another soldier confirmed that "the only permission is if we have like a platoon as a whole. They have – when we go off-post, we have to have like an NCOIC, an officer with us that's from our unit."

No witnesses, including those called by the defense, testified that the command ever expressly modified the order to allow for drinking *on-post*. On appeal, appellant places great weight on the testimony of the company commander, who stated, "Later on in time that was relaxed to allow, I believe it was two alcoholic drinks. And then they were allowed to go off post to like five establishments." To the extent the company commander's testimony created any ambiguity pertaining to the permissibility of drinking both on-post and off-post, every other witness who addressed this issue was certain that the command never modified the order to allow drinking on-post. For example, the first sergeant testified that even under the modified policy, members of appellant's unit could not drink on-post and when similarly asked on direct examination whether the modified policy allowed for drinking on-post, another soldier in the same unit replied, "Oh no, that, that didn't apply to that, ma'am."

Finally, it was unclear from the testimony when the modification allowing off-post drinking even took effect, as multiple witnesses seemed to believe that this change occurred *after* the date of the barbecue at issue in this case.

### 2. Analysis

As set forth above, *Harvey* governs our review of factual sufficiency. Given that the witnesses expressed some ambiguity about the order, to include the company's commander's testimony, we find that appellant has set forth a sufficient "showing of a deficiency" to trigger our Article 66 review.

Based on our own review and weighing of all the evidence in the record of trial, however, we are still clearly convinced that appellant was guilty beyond a reasonable doubt. Likewise, while we agree with the panel's guilty verdict on the failure to obey a lawful order specification, given the fact that no witness, or even appellant himself in his CID interview, ever expressly stated that the commander modified the order to allow for drinking on-post, this is simply not a case which calls for a high level of deference to the fact-finder's credibility determinations.

*C. Conduct Unbecoming Specification*

Appellant avers his conviction for conduct unbecoming an officer by consuming alcohol with noncommissioned officers and soldiers in a deployed environment is factually insufficient.  For the reasons set forth below, we disagree.

*1. Law*

Again, *Harvey* governs our review of factual sufficiency.  The elements of a violation of Article 133, conduct unbecoming an officer are: (1) "the accused did or omitted to do a certain act;" and (2) "under the circumstances, the act or omission constituted conduct unbecoming an officer and [a] gentleman." *Manual for Courts-Martial, United States* (2019 ed.) [*MCM*], pt. IV, ¶ 90.b.; *United States v. Lofton*, 69 M.J. 386, 388 (C.A.A.F. 2011).  In addition, an officer's conduct need not violate other provisions of the UCMJ or even be criminal, but must only "disgrace[] him personally or bring[] dishonor to the military profession such as to affect 'his fitness to command the obedience of his subordinates so as to successfully complete the military mission.'" *United States v. Schweitzer*, 68 M.J. 133, 137 (C.A.A.F. 2009) (quoting *United States v. Forney*, 67 M.J. 271, 275 (C.A.A.F. 2009)); *see also United States v. Meakin*, 78 M.J. 396, 404 (C.A.A.F. 2019) (holding that the "heightened standard for officers [subject to Article 133 charges] commands respect and obedience and preserves their ability to lead and command their subordinates." (citing *Parker v. Levy*, 417 U.S. 733, 743-45 (1974)); *United States v. Gonzalez*, __ M.J. __, 2025 CAAF LEXIS 761, at *6 (C.A.A.F. 15 Sept. 2025) ("'The gravamen of the [Article 133, UCMJ,] offense is that the officer's conduct disgraces him personally or brings dishonor to the military profession such as to affect his fitness to command the obedience of his subordinates so as to successfully complete the military mission.'" (alteration in original) (quoting *Lofton*, 69 M.J. at 388)).

*2. Analysis*

Appellant argues that because his commander mandated that members of the unit could only drink alcohol when an officer was present, his conduct unbecoming conviction for drinking with enlisted soldiers at the barbecue is factually insufficient.  Specifically, appellant points to the testimony of the first sergeant, who described how the order was modified to allow for drinking off-post only if there was a "mingle of both officers and enlisted. . . . to make sure that everybody's following the two-drink rule."  Appellant also highlights that another soldier testified, "when we go off post [to drink], we have to have like an NCOIC, an officer with us that's from our unit."

In addition, appellant claims the first sergeant testified that it would not have been disgraceful to the armed forces "for an officer to consume alcohol in the presence of enlisted Soldiers on" MK Airbase.  This, however, is *not* what the first

11

sergeant testified to. Specifically, when asked if he thought it would be a "disgrace to the Armed Forces for *noncommissioned officers* and Soldiers to be consuming alcohol while in Romania at that time[,]" he responded, "No, ma'am, I would not." Simply put, defense counsel never asked the first sergeant what he thought about *officers* drinking with enlisted personnel, nor was he even asked if it would be problematic for NCOs and enlisted personnel to be drinking together at *the same time*.

Appellant relies heavily on *United States v. Guaglione*, 27 M.J. 268 (C.M.A. 1988), in support of this second point. In that case, appellant's battery commander, battalion commander, and first sergeant all testified that his actions amounted to no more than "poor judgment," with his battalion commander and first sergeant refusing to characterize his conduct as "unbecoming." 27 M.J. at 270-72. As such, the Court of Military Appeals held there was insufficient evidence to sustain an Article 133 conviction. *Id.* at 273. In this case, however, no senior officer ever testified on appellant's behalf, and as noted above, appellant misrepresents the first sergeant's testimony. As such, *Guaglione* is easily distinguishable.

In this case, there is no evidence that the commander ever mandated that officers be present when enlisted soldiers drank on-post; to the contrary, the command issued an order that prohibited anyone from drinking on-post. Nor is there any evidence that anyone in appellant's chain of command ever expressed an opinion that his conduct was not "unbecoming." In short, we reject both appellant's assertion that his command "mandated" that officers drink with enlisted soldiers on-post and his misrepresentation of the record that his first sergeant testified that it was not disgraceful for officers and enlisted to be drinking together on MK Airbase. Accordingly, we decline to find that there is a "weakness in the evidence" that undercuts any of the elements of the alleged Article 133 offense.

But, even if we were to reach appellant's factual sufficiency claim, this specification essentially boils down to the panel's implicit finding that his conduct in not only flouting the order prohibiting drinking on-post in a deployed environment but also drinking with enlisted soldiers "affect[ed] 'his fitness to command the obedience of his subordinates so as to successfully complete the military mission.'" *Schweitzer*, 68 M.J. at 137 (citation omitted). Based on our own review and weighing of all the evidence in the record of trial, we agree with the panel and are clearly convinced beyond a reasonable doubt that appellant was guilty of conduct unbecoming an officer.

### D. Maltreatment Specification

Appellant makes two separate challenges to his maltreatment specification: (1) it is fatally ambiguous under *United States v. Walters*, 58 M.J. 391 (C.A.A.F. 2003); and (2) it is factually insufficient. Because we find that the conviction for

this specification is factually insufficient, we need not reach appellant's first contention.

## 1. Law

*Harvey* governs our review of factual sufficiency. The elements of Article 93 maltreatment are: (1) "a certain person was subject to the orders of the accused;" and (2) "the accused was cruel toward, or oppressed, or maltreated that person." *MCM*, pt. IV, ¶ 19.b. In *United States v. Carson*, the CAAF held that in a maltreatment case, because the "essence of the offense is abuse of authority," the government need only prove that, under an objective standard, the accused's actions reasonably could have caused physical or mental harm or suffering. 57 M.J. 410, 415 (C.A.A.F. 2002); *see also United States v. Caldwell*, 75 M.J. 276, 280 (C.A.A.F. 2016) ("Moreover, such conduct [underlying a maltreatment conviction] need not result in actual harm to the victim – either mental or physical – because 'the essence of the offense is abuse of authority.'" (alteration omitted) (quoting *Carson*, 57 M.J. at 415)).

On the other hand, in *United States v. Fuller*, the CAAF held that "'Art[icle] 93, UCMJ, . . . is not a strict liability offense punishing all improper relationships between superiors and subordinates.'" 54 M.J. 107, 111 (C.A.A.F. 2000) (quoting *United States v. Johnson*, 45 M.J. 543, 544 (Army Ct. Crim. App. 1997), pet. denied, 48 M.J. 345 (C.A.A.F. 1997)), rev'd on other grounds, *United States v. Miller*, 67 M.J. 385, 389 (C.A.A.F. 2009). Specifically, in *Fuller* the CAAF found the maltreatment specification to be legally insufficient where the government failed to present evidence that: (1) the victim ever felt coerced to have sex with appellant because of his rank; (2) appellant in any way used his rank to pressure the victim to have sex; or (3) that appellant knew the victim was "extremely intoxicated." *Id.* at 111-12; *see also United States v. Cardenas*, ARMY 20180416, 2019 CCA LEXIS 479, at *9-10 (Army Ct. Crim. App. 27 Nov. 2019) (mem. op.) (holding that maltreatment conviction factually insufficient where no evidence that victim ever alluded to appellant's rank or position bearing on her consent to enter into consensual personal relationship), aff'd, 80 M.J. 420 (C.A.A.F. 2021). Finally, the fact that the victim may have consented or acquiesced is not an absolute defense to maltreatment but rather is only one factor to consider. *United States v. Patton*, ARMY 20150675, 2017 CCA LEXIS 237, at *8 (Army Ct. Crim. App. 7 Apr. 2017) (mem. op.); *see also United States v. Harris*, 41 M.J. 890, 893-94 (Army Ct. Crim. App. 1995) (evidence going to consent to sexual conduct would have had probative value in defending against maltreatment, and excluding the evidence was prejudicial error).

## 2. Analysis

As was the case in both *Fuller* and *Cardenas*, there is no evidence in this case that the victim ever felt coerced to engage in sexual activities with appellant, or that

appellant in any way used his rank to pressure her to participate in such conduct. There is also no evidence that the victim ever suffered or was reasonably likely to suffer physical or mental harm. To the contrary, none of the three soldiers who encountered the victim in the latrine testified that she was crying or in any way appeared upset when they found her. One of the females testified that after they returned to the barracks, the victim was a "happy drunk" and joked about "popping champagne" after another soldier dropped a soda. Likewise, another female soldier testified that when she asked the victim if appellant took advantage of her, she responded, "No, he is my friend." The victim herself testified that she had no recollection of the events in question other than being "kissed on" in the latrine, and that she "thought I'd been assaulted" based on "what was being told to me" by her friends, and because she "could tell the next morning that something had been inside of me." Finally, appellant asserted in his CID interview that the sexual activity was fully consensual and described how the victim took a leading role.

The government contends that the maltreatment specification is factually sufficient because the evidence proved beyond a reasonable doubt that the victim did not consent to either kiss, notwithstanding the fact that the panel acquitted appellant of the sexual assault charges. We recognize that the panel's not guilty findings for the sexual assault and false statement charges do not necessarily compel us to conclude that the victim consented to either kiss. *See United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) ("Defendants are generally acquitted of offenses, not of specific facts, and thus to the extent facts form the basis for other offenses, they remain permissible for appellate review."). Nevertheless, based on our own independent review of the record, we disagree with the government that the evidence proved beyond a reasonable doubt that the victim did not consent. To the contrary, we find it far more likely that both the kiss in the shack and the kiss in the latrine were consensual.

Starting with the obvious, there is virtually no evidence in the record that the victim did *not* consent to kissing appellant. To the contrary, and consistent with appellant's statement that everything that occurred during the course of the evening was consensual, multiple witnesses testified that the two were laughing and giggling in the shack, and in response to a question, the victim said she "was good." In addition, both appellant and another soldier said he and the victim were lying on the ground fully clothed while in the shack. Finally, as noted above, the victim was described as being a "happy drunk" when she got back to the barracks and specifically told one of her roommates that appellant did *not* take advantage of her.

We acknowledge that, unlike both *Fuller* and *Cardenas,* where there was no dispute that the victim consented to the conduct at issue, the best we can say in this case is that the government did not prove lack of consent beyond a reasonable doubt. There is also, however, no evidence that appellant's rank played any role in the offense nor is there any evidence, when viewed under an objective standard, that his

actions reasonably could have caused the victim physical or mental harm. While the victim may have regretted her actions the next morning and felt bad about the fact that the amount of alcohol she drank may have lowered her inhibitions, that is not the type of "mental suffering" sufficient to support a maltreatment conviction.

In sum, with respect to the second *Harvey* trigger, given that there is no evidence in the record that the victim did not consent to kissing appellant, appellant has met his burden to "identify a weakness in the evidence admitted at trial to support an element . . . ." *Valencia*, 85 M.J. at 535. Moreover, given that the victim testified that she had no recollection of the events in question other than being "kissed on" in the latrine, and that she "thought I'd been assaulted" based on "what was being told to me" by her friends the next morning, we give minimal deference to the panel's assessment of her testimony as it pertains to the specific issue of whether she was "maltreated." Finally, given that the factfinder heard appellant's version of events in question via a videotape of his CID interview, we again determine that our deference to the panel's evaluation of this evidence is minimal. *See Harvey*, 85 M.J. at 131 ("In contrast, when the CCA can assess documents, videos, and other objective evidence just as well as the court-martial, the CCA might determine that the appropriate deference required is low.").

Turning to our factual sufficiency determination, for all of the reasons above, and based on our review and weighing of the entire record, we are clearly convinced that the government failed to prove that appellant is guilty of maltreatment beyond a reasonable doubt. As such, this specification is factually insufficient and must be set aside.

## CONCLUSION

The findings of guilty to The Specification of Charge III and Charge III are SET ASIDE, and that specification and charge are DISMISSED. The remaining findings of guilty are AFFIRMED.

Having considered the entire record, and after reassessing the sentence in accordance with the principles articulated by our superior court in *United States v. Sales*, 22 M.J. 305, 307-08 (C.M.A. 1986), and *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013), we AFFIRM the original sentence as entered in the Judgment of the Court.

Senior Judge MORRIS and Judge JUETTEN concur.

ARGUELLES, Judge, concurring;

I write separately only to explain why appellant's fatal ambiguity challenge to the maltreatment specification is also without merit.

The Specification of Charge III alleged appellant did "maltreat [the victim], a person subject to his orders, by kissing [the victim's] mouth." Appellant argues that because there was evidence he actually kissed the victim on two separate occasions, specifically first in the shack and then later in the latrine, his conviction is fatally ambiguous pursuant to *United States v. Walters*, 58 M.J. 391 (C.A.A.F. 2003), and must be set aside.

We review de novo whether a conviction is fatally ambiguous. *United States v. Rodriguez*, 66 M.J. 201, 203 (C.A.A.F. 2008).

### A. United States v. Walters

In *United States v. Walters*, the Court of Appeals for the Armed Forces [CAAF] held that where an accused is charged with committing an illegal act "on divers occasions," but the panel returns a guilty verdict by exceptions and substitutions to a single, unspecified act, the conviction must be set aside because the Criminal Court of Appeals cannot "find as fact any allegation in a specification for which the fact-finder below has found the accused not guilty." 58 M.J. at 395 (citations omitted).

Appellant is correct there was evidence that he and the victim kissed two separate times, specifically in the shack and in the latrine, despite the specification alleging only a single kiss. Appellant now asserts that since we do not know which kiss formed the basis for the panel's guilty verdict, we cannot perform an Article 66 factual sufficiency review, which in turn renders the guilty finding fatally ambiguous. In support of his argument, appellant cites *Walters* and a number of cases that followed it, all of which again stand for the proposition that where the government charges an accused with committing an offense on divers, or multiple, occasions, and the panel returns a verdict by exceptions and substitutions to a single unspecified act, the conviction cannot stand. *See, e.g., United States v. Augspurger*, 61 M.J. 189, 190 (C.A.A.F. 2005) (holding that when the phrase "on divers occasions" is removed from a specification, the effect is "that the accused has been found guilty of misconduct on a single occasion and not guilty of the remaining occasions.").

Unlike *Walters* and its progeny, however, the maltreatment specification in this case did *not* allege that appellant kissed the victim on more than one occasion. Likewise, because the panel did not return its verdict with "exceptions and substitutions," there is no evidence that it found appellant not guilty of either the kiss in the shack or the kiss in the latrine. Indeed, the CAAF has repeatedly held that *Walters* "applies only in those narrow circumstances involving the conversion of a divers occasions specification to a one occasion specification through exceptions and substitutions by the members." *Rodriguez*, 66 M.J. at 205 (cleaned up) (quoting *United States v. Brown*, 65 M.J. 356, 358 (C.A.A.F. 2007)).

In *Rodriguez*, the panel found appellant guilty of using marijuana on "divers occasions." *Id.* at 202. Although the government presented evidence that appellant used marijuana three separate times, on appeal it was determined that the evidence for only one of those uses was factually sufficient. *Id.* at 202-03. Rejecting appellant's *Walters* challenge, the CAAF held that, unlike a general verdict, where it is presumed that the verdict attaches to each of the alleged multiple acts, the *Walters* rule applies only where "the members' exceptions and substitutions on the findings worksheet implicitly meant that the factfinder had found that the accused was not guilty of some of the acts alleged at trial." *Id.* at 204-05.

Put another way, because the panel here did not either implicitly or explicitly find that appellant did not kiss the victim in either the shack or the latrine, the logic and reasoning of *Walters* and its progeny is not applicable to this case.

### B. Unanimity of Fact vs. Unanimity of Theory

The Supreme Court and the federal circuit courts have held that there is a difference between unanimity of fact and unanimity of theory. In *Schad v. Arizona*, 501 U.S. 624 (1991) (plurality opinion), the Supreme Court rejected the approach of requiring jury unanimity when the means used to commit an offense simply satisfied an element of a crime and did not themselves constitute a separate offense or an element of an offense. 501 U.S. 624, 630-33 (1991). In *Richardson v. United States*, the Supreme Court similarly held that although a jury in a federal criminal case cannot convict unless the Government proves each "element" beyond a reasonable doubt, it "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." 526 U.S. 813, 817 (1999) (citing *Schad*, 501 U.S. at 631-32; *Andersen v. United States*, 170 U.S. 481, 499-501 (1898)).

Using the example of the robbery element of force or the threat of force, the Court in *Richardson* held that "some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement -- a disagreement about means -- would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely that the defendant had threatened force." *Id.* (citing *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring)).

Along the same lines, the majority of federal and state courts recognize a distinction between unanimity of theory, which refers to alternate means of committing a charged criminal act, and unanimity of fact, which refers to multiple and distinct acts of the same type of criminal conduct charged as a single offense. As concisely explained by the Seventh Circuit Pattern Criminal Instructions:

> When *Richardson v. United States*, 526 U.S. 813 (1999), and *Schad v. Arizona*, 501 U.S. 624, 631–32 (1991) (plurality opinion), are read together, it appears that unanimity is required when the government alleges more than one possibility for an element of the crime (*e.g.*, a false statement charge in which the government charges that the defendant made one or more of three alleged false statements), but not when the government contends that the defendant committed an element of the crime using one or more of several possible means (*e.g.*, an armed robbery charge in which the government charges that the defendant committed a robbery using a knife, or a gun, or both). *Richardson*, 513 U.S. at 817.

William J. Bauer Pattern Crim. Jury Instructions of the Seventh Cir., inst. 4.04 cmt. (2023 ed.).[5]

---

[5] *See also United States v. Newell*, 658 F.3d 1, 22 (1st Cir. 2011) ("As we have noted, it is true that a jury does not need to agree upon 'a single means of commission' . . . . it does not follow from the fact that unanimity is not required with respect to alternative means of committing one and the same criminal act that unanimity is not required with respect to multiple instances of the same type of criminal act." (emphasis omitted) (citations omitted)); *United States v. Chen Chiang Liu*, 631 F.3d 993, 1000 (9th Cir. 2011) (A general unanimity instruction is not sufficient if it appears "that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." (internal quotation marks omitted) (citation omitted)); *United States v. Sila*, 978 F.3d 264, 267 (5th Cir. 2020) ("But an exception to the general rule arises when the 'differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses.'") (citation omitted)); Crim. Pattern Jury Instructions, inst. 1.24 (Crim. Pattern Jury Instruction Comm. of the United States Ct. of Appeals for Tenth Cir. 2025 ed.) ("Your verdict must be unanimous. Count —— of the indictment accuses the defendant of committing the following acts: [description of individual acts]. The government does not have to prove all of these different acts for you to return a guilty verdict on count ——. But in order to return a guilty verdict, all twelve of you must agree upon which of the listed acts, if any, the defendant committed *and* that he committed at least [number of acts identified above] of the acts listed." (emphasis in original)); *United States v. Powell*, 226 F.3d 1181, 1196 (10th Cir. 2000) ("Following *Richardson*'s instruction that when determining whether a specific unanimity instruction is required we must differentiate between 'means' and 'elements,' we conclude that here the various acts

(continued . . .)

The CAAF, however, appears to have rejected any such distinction between unanimity of fact and unanimity of theory. Specifically, in *United States v. Nicola*, the government charged appellant with one specification of "knowingly and wrongfully viewing the private area of [the victim] without her consent, and under circumstances in which she had a reasonable expectation of privacy[,]" in violation of Article 120c, UCMJ. 78 M.J. 223, 225 (C.A.A.F. 2019) (first alteration omitted, second alteration altered) (internal quotation marks omitted). The evidence, however, showed that appellant first indecently viewed the victim when he brought her back to her room and then indecently viewed her while she was in the shower. *Id.* at 226. The CAAF held that the government could prove its case under two different "theories," one being that appellant indecently viewed the victim when she was first in her room, and the other being that he indecently viewed her in the shower. *Id.*

In other words, unlike the federal and state courts cited above, the CAAF in *Nicola* had no issue with the government presenting "multiple instances of the same type of criminal act" to prove up a single allegation of that criminal act. *Newell*, 658 F.3d at 22 (emphasis omitted). Instead, the CAAF ultimately held that because the evidence was legally sufficient to support both "theories," that is indecent viewing in the room and indecent viewing in the shower, it affirmed the conviction. *Nicola*, 78 M.J. at 227-30.

Further explaining, the CAAF reiterated that where there is no indication that the factfinder has rejected either of the acts in question, "'a factfinder may enter a general verdict of guilt even when the charge could have been committed by two or more means, as long as the evidence supports at least one of the means beyond a reasonable doubt.'" *Id.* at 226 (alteration omitted) (quoting *Brown*, 65 M.J. at 359); *see also United States v. Vidal*, 23 M.J. 319, 325 (C.M.A. 1987) ("It makes no difference how many members choose *one act* or the other, one theory of liability or the other." (emphasis added)).

---

(. . . continued)
which the jury was to consider -- seize, confine, inveigle, decoy, kidnap, abduct, and carry away and hold -- fall closer to the 'means' end of the means/element spectrum."); *People v. Russo*, 25 Cal.4th 1124, 1132 (2001) ("This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (citation omitted)); *People v. Deletto*, 147 Cal.App.3d 458, 472 (1983) ("The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count." (emphasis in original)).

The CAAF in *Nicola* did not, however, explain how its conflation of the concepts of unanimity of fact and unanimity of theory comports with the Supreme Court's holding in *Richardson* that there is a distinction between the requirement of jury unanimity on elements versus means underlying the element. Likewise, although the CAAF in *Brown* cited *Griffin v. United States*, 502 U.S. 46 (1991), for the proposition that a "factfinder may enter a general verdict of guilt even when the charge could have been committed by two or more *means* . . . ." it also couched its holding on the fact that the government charged a single incident of rape "as a continuing course of conduct over a short period of time." 65 M.J. at 358-59 (emphasis added). Finally, the CAAF has also not meaningfully addressed the extensive body of federal and state case law recognizing a distinction between unanimity of fact and unanimity of theory.[6]

In short, while the panel clearly found appellant guilty on the government's "theory" that he maltreated the victim by kissing her, we have no way of knowing if the requisite number of the panel members found that the government proved beyond a reasonable doubt that appellant kissed the victim either in the shower, or in the shack, or in both. Likewise, it is also entirely possible that some of the panel members believed that appellant kissed the victim only in the shower, while others concluded that he kissed her only in the shack. Simply put, because there is a difference between the government's "theory" and the multiple separate and distinct *acts* constituting separate offenses offered into evidence to support that theory, the failure to give a unanimity of fact instruction in this case would constitute error in the majority of federal and state jurisdictions. Nevertheless, under *Nicola* and the current state of CAAF precedent, this distinction is without a difference and does not render appellant's conviction fatally ambiguous.

FOR THE COURT:

JAMES W. HERRING, JR
Clerk of Court

---

[6] In *Brown*, the CAAF distinguished a Ninth Circuit case dealing with unanimity of fact (*United States v. Garcia-Rivera*, 353 F.3d 788 (9th Cir. 2003)) on the grounds that it did not "involve[] a single course of conduct . . . ." 65 M.J. at 359. In light of the federal and state caselaw discussed above, however, I respectfully encourage the CAAF to provide additional clarity and/or reconsider its analysis of this issue. *See United States v. Tovarchavez*, 78 M.J. 458, 465 (C.A.A.F. 2019) ("[I]t is for this Court, not the ACCA, to overrule our precedent") (citation omitted).